Michael J. Satz State Attorney Fort Lauderdale
QUESTIONS:
1. Did the allegations of Sunrise Councilman Shaw and Councilwoman Brown published September 28, 1976, violate the nondisclosure provisions of s. 112.317(6), F. S.?
2. Did Councilwoman Brown's pronouncements at the February 8, 1977, city council meeting, which were later publicized by the news media, violate the nondisclosure provision of the statute?
SUMMARY:
Based upon the facts supplied to this office by the state attorney for the seventeenth judicial circuit, it does not appear that a sufficient factual basis exists in order to sustain a conviction under s. 112.317(6), F. S.
STATEMENT OF FACTS:
In the September 28, 1976, editions of the Fort Lauderdale News
and The Miami Herald there appeared articles whereby Councilman Walter Shaw and Councilwoman Pat Brown alleged a conflict of interest on the part of Sunrise Councilman Theodore Bradshaw.
The facts indicate that in the September 28, 1976, editions of theFort Lauderdale News and The Miami Herald there appeared articles whereby Councilman Walter Shaw and Councilwoman Pat Brown alleged a conflict of interest on the part of Sunrise Councilman Theodore Bradshaw because All-City Security Corporation, partially owned and operated by Bradshaw's wife, had the contract to provide the security for the construction site of the Sunrise Convention Center. In response to this publicity, the general contractor terminated the use of All-City Security on the date the articles appeared.
In a letter received by the Commission on Ethics on November 19, 1976, Councilman Bradshaw requested an advisory opinion as to whether or not a conflict of interest existed. In CEO 76-213 dated December 17, 1976, Donald H. Reed, Jr., Chairman of the Commission on Ethics, and Lawrence A. Gonzalez, Executive Director of the commission, concluded:
 We find there is no prohibitive conflict of interest where a city councilman's spouse owns or is an officer of a security agency which provides guards for a general contractor at the site of building being constructed for the City.
Councilman Bradshaw has testified he provided a copy of this opinion to his fellow members of the city council.
Subsequently, at a city council meeting held on February 8, 1977, Councilwoman Brown requested travel funds for the purpose of traveling to Tallahassee to confer with the Commission on Ethics in regard to the above-described situation concerning Councilman Bradshaw. In a letter dated March 1, 1977, Mr. Gonzalez advised Councilman Bradshaw a complaint had been lodged and a confidential preliminary investigation was under way. In a letter dated April 22, 1977, Mr. Gonzalez informed Councilman Bradshaw of the results of the preliminary investigation report. In a letter dated May 3, 1977, Councilman Bradshaw was informed by Mr. Gonzalez that a probable cause hearing would be held on May 18, 1977.
In the February 12, 1977, edition of the Broward Times there appeared an article on Ms. Brown's request for travel funds to travel to Tallahassee to confer with the Commission on Ethics as to the alleged conflict of interest by Councilman Bradshaw. The article stated her complaint was concerning the All-City Security contract, and, further, the fact that Councilman Bradshaw's son was employed by the city fire department. The article also stated she was concerned about a possible conflict of interest as to Councilman Cecil Shine's employment at the Sunrise Convention Center while he was serving as a councilman.
In the March 5, 1977, edition of The Broward Times there appeared an article stating Ms. Brown had returned from her trip to meet with the Commission on Ethics. She refused comment on her discussions with the commission because of the confidentiality provision. The article then described her prior allegations.
AS TO QUESTION 1:
It does not appear from the information furnished to this office that either Councilman Shaw or Councilwoman Brown willfullydisclosed their intention to file a complaint or the existence or contents of a complaint which had been filed with the commission by the publication of their remarks in the September 28, 1976, editions of the Fort Lauderdale News or The Miami Herald. Nothing in s. 112.317(6), F. S., purports to prohibit an individual from alleging certain misconduct against a public official subject to part III, Ch. 112, F. S. Section 112.317(6), by its terms, and in pertinent part, only prohibits the willful disclosure of an intention to file a complaint or the existence or contents of a complaint which has been filed with the commission. The remarks attributed to Councilman Shaw and Councilwoman Brown did not mention any complaint which they filed or intended to file with the commission against Councilman Bradshaw. Accordingly, I do not believe that the remarks of September 28, 1976, would be found to violate the nondisclosure provisions of s. 112.317(6).
AS TO QUESTION 2:
It would not appear that s. 112.317(6), F. S., was violated by Councilwoman Brown's remarks at the February 8, 1977, city council meeting. Her remarks could reasonably be construed to be directed to the substance of the advisory opinion issued December 17, 1976, by the Commission on Ethics as opposed to a confidential complaint. Councilman Bradshaw apparently freely and voluntarily waived the protection of s. 112.322(2)(a), F. S., by providing copies of the opinion to fellow members of the city council.
The remarks published in the February 12, 1977, edition of theBroward Times when read in conjunction with the February 8, 1977, statements could possibly be construed as violative of s.112.317(6), F. S. However, I believe it is significant that the remarks dealt specifically with the alleged conflict of interest of Councilman Bradshaw and could also be reasonably construed to relate to the commission's previous opinion on this subject. If Councilwoman Brown's remarks were in reference to her continued concern and disagreement with the commission over CEO 76-213, the statute would not apply since, at that point in time, the advisory opinion process of the commission was a matter of public record. The statements attributed to Councilwoman Brown concerning her `complaint' with the All-City Security contract can obviously be interpreted to refer to a specific complaint filed with the commission or to her general dissatisfaction with the contract and Councilman Bradshaw. The former construction would obviously implicate s. 112.317(6), while the latter would not. Obviously, this is a question of fact as to what was intended by her remarks.
While the ultimate responsibility for deciding whether to prosecute rests with you as the state attorney, see Imparato v. Spicola, 238 So.2d 503 (2 D.C.A. Fla., 1970), I am compelled to note that a prosecution instituted under the facts as stated in your letter would assuredly invite a constitutional challenge to s. 112.317(6), F. S.
Section 112.317(6), F.S., does not purport to regulate time, place, or manner of expression; nor does it proscribe conduct. What it does attempt to prohibit is expression itself, when the expression deals with a particular subject, i.e., allegations of official misconduct.
It has long been recognized that `[t]he constitutional guarantees of freedom of speech forbid the states to punish the use of words or language not within `narrowly limited classes of speech.' `Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942). Gooding v. Wilson, 405 U.S. 518, 521-522 (1972). Chaplinsky delineated the classes of proscribed speech to include: `[T]he lewd and the obscene, the profane, the libelous and the insulting or `fighting words." The Florida statute has, for all practical purposes, made it a crime to speak the truth. In Thornhill v. Alabama,310 U.S. 88, 101-102 (1940), it was stated:
 The freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss publicly and truthfully all matters of public concern, without previous restraint or fear of subsequent punishment.
In New York Times v. Sullivan, 376 U.S. 254, 270, the court observed the following regarding free speech in the context of attacks on government officials and institutions:
 [S]peech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.
Similarly in Garrison v. Louisiana, 379 U.S. 64, 72-73 (1964), the court concluded that:
 In any event, where the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth.
 Truth may not be the subject of either civil or criminal sanctions where the discussion of public affairs is concerned.
When First Amendment rights are directly implicated, the courts have engaged in the closest judicial scrutiny of the questioned legislation. See Buckley v. Valeo, 422 U.S. 1, 64-65 (1975). The government interest advanced must be paramount — one of vital importance — and the burden is on the government to show the existence of such an interest. Elrod v. Burns, 427 U.S. 347, 363
(1972).
Assuming that a prosecution was brought under s. 112.317(6), F. S., and the statute was challenged on First Amendment grounds, a number of state interests could be asserted to demonstrate a compelling state interest. Among the interests which could be asserted are: The protection of the reputation of public officials by shielding them from publicity involving frivolous complaints; the protection of public confidence in government officials by preventing disclosure of a complaint until a determination is made that the charge is well-founded; and the protection of complainants and witnesses from possible recrimination by prohibiting disclosure of their identity prior to a determination that a complaint is meritorious. Ultimately, whether any of these interests can be characterized as compelling or meet the clear and present danger test is a judicial determination. Cf. Landmark Communications, Inc. v. Commonwealth of Virginia, 233 S.E.2d 220
(Va. 1977), probable jurisdiction noted June 13, 1977. Prior to instituting criminal proceedings under s. 112.317(6), F. S., I would hope that a careful consideration is given, not only to the facts of this situation as applied to the statute, but also the possible constitutional issues which will inevitably be faced by such a prosecution.
Prepared by: Sharyn L. Smith, Assistant Attorney General